**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NUMBER:  24-cv-2645

JOSE A. TELLEZ, an individual,

Plaintiff,

v.

WALMART INC., WALMART STORES EAST, LP

Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Jose A. Tellez ("Tellez" or "Plaintiff"), by his undersigned attorneys, states as follows for his Complaint against Walmart Inc. and Walmart Stores East, LP (collectively "Walmart" or "Defendants"):

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

2.      This Court has personal jurisdiction over Defendants because Defendants employ individuals in Colorado, formerly employed Plaintiff in Colorado, conduct substantial business in the state, and committed torts within the State of Colorado as further described herein.

3.      This action arises under the Civil Rights Act of 1866, as amended, 42 U.S.C.

1

§§ 1981 and 1981a (collectively "Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). More specifically, this action arises from the conduct of Defendants in discriminating against its employees of Hispanic and/or Latin American descent and/or national origin and retaliating against employees who complain of discrimination or otherwise engage in activities protected by Section 1981 and Title VII.

4.      Venue is proper in this Court because all actions complained of were carried out within the State of Colorado, and Plaintiff was employed by Defendants in the State of Colorado.

5.      Plaintiff met all procedural pre-requisites for, and timely filed, this Complaint pursuant to Title VII.

6.      Specifically, Plaintiff filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC").

7.      As to his first charge, filed on or around May 27, 2021, the EEOC found reasonable cause to believe that Walmart violated Title VII.

8.      The EEOC's reasonable cause finding is extraordinary because the EEOC rarely finds cause in its cases.

9.      Per the EEOC's own statistics, over the past three years, the EEOC has found cause in less than one and a half percent (1.5%) of its race-based charges of discrimination, such as Mr. Tellez's.

10.     The EEOC issued Tellez a notice of right to sue on July 12, 2024, on his first charge, which gave him 90 days to file his lawsuit.

11.     Tellez was unable to let the EEOC finish its investigation of his second EEOC

charge.

12.     Thus, Tellez requested his notice of right to sue on September 23, 2024, and it was issued on September 24, 2024.

## THE PARTIES

13.     Plaintiff was born in the United States and is of Latin American descent. Plaintiff worked as an employee for Walmart for nearly seven years between 2015 and 2022.

14.     Defendant Walmart Inc. is a publicly traded foreign corporation, incorporated under the laws of Delaware and whose principal address is 702 SW 8th St, Bentonville, AR 72716.

15.     Defendant Walmart Stores East, LP is a foreign limited partnership, organized under the laws of Delaware and whose principal address is 702 SW 8th St, Bentonville, AR 72716.

16.     Defendants jointly employed Plaintiff.

17.     Each Defendant engaged in discriminatory and retaliatory behavior towards Plaintiff as further alleged herein.

## GENERAL ALLEGATIONS

18.     Walmart hired Tellez on or around July 28, 2015, as an Orderfiller Non-Conveyable, working at Walmart's Loveland, Colorado distribution center ("Distribution Center").

19.     On or around July 22, 2018, Walmart promoted Tellez to a General Maintenance Associate.

20.     In the months after Tellez transferred to the Distribution Center, Walmart

3

prevented Tellez from taking breaks, which caused Tellez to develop kidney stones.

21.     White employees were always allowed to take their breaks.

22.     At the Distribution Center, one of Tellez's trainers was a white man named Buck Atkin ("Atkin").

23.     At all times relevant to this Complaint, Atkin was a Maintenance Technician.

24.     Atkin had limited supervisory authority over Tellez because he was one of Tellez's trainers.

25.     Despite the fact that Atkin was not Tellez's supervisor or manager, Atkin asserted complete supervisory authority over Tellez because of Tellez's race and ethnicity.

26.     Atkin was a primary harasser of Tellez, beginning as early as 2018, when Tellez started working with Atkin as a Maintenance Associate.

27.     Atkin was overtly racist during all times relevant to this Complaint.

28.     Atkin directed his racial animus towards Tellez.

29.     Atkin's racially harassing behavior towards Tellez was severe and pervasive.

30.     Atkin's racially harassing behavior towards Tellez was so severe and pervasive that it altered the terms and conditions of Tellez's employment.

31.     Atkin's racially harassing behavior stemmed the entirety of Tellez's employment.

32.     Atkin alleged that he was in the United States Military and was actively deployed to parts of the Middle East.

33.     Atkin held prejudices against people from the Middle East, which he openly communicated to his co-workers.

4

34.     Atkin stated that people from the Middle East repulsed him.

35.     Atkin stated that he had negative views of people from the Middle East.

36.     Atkin claimed that people from Iraq and Afghanistan are negative people and full of hate.

37.     Atkin claimed that people from the Middle East had low standards, quality, efficiency, and were dishonest.

38.     Atkin made negative comments about the physical appearance of people from the Middle East.

39.     Atkin told Tellez that Tellez looked like the people from the Middle East and reminded him of them.

40.     After making discriminatory comments about people from the Middle East, Atkin would taunt Tellez and ask him "What do you think about that?"

41.     When Atkin made negative comments about people from the Middle East, it was greatly offensive to Tellez, in part, because Atkin associated Tellez with people from the Middle East.

42.     Atkin openly mocked Tellez by calling him the "Hispanic" and "LatinX" with regularity.

43.     Atkin, without knowing the national origin of Tellez, called him Mexican.

44.     Atkin told Tellez about a fantasy his mother had, wherein his mother was gang-banged in the back of an old Ford Pinto by two fat sweaty Mexicans in a parking lot of a trailer park.

45.     After telling this offensive story to Tellez, Atkin looked at him and asked, "What

do you think about that?"

46.     Atkin called a crescent wrench a "Mexican speed wrench."

47.     Atkin also called Tellez's tools, "Mexican tools."

48.     Atkin mocked Tellez's religion (Christianity) and stated that it was fake.

49.     Atkin singled out and harassed Tellez, treating him differently than Atkin's white, non-Hispanic coworkers.

50.     Atkin also sought-out confrontations with other people of Hispanic descent and treated them differently than Atkin's white, non-Hispanic coworkers.

51.     The confrontations with other Hispanic employees always had a familiar pattern of Atkin barking orders at them and treating them with utter disrespect, even when Atkin had no supervisory authority over the other employees.

52.     Atkin claimed that people of color use the "race card" for illegitimate purposes.

53.     Atkin bullied and demeaned Tellez because of his race and ethnicity.

54.     Atkin frequently referred to Tellez as "fat ass."

55.     In January 2021, Atkin threatened Tellez that he would punch Tellez "so hard in the face that it will break every bone in my wrist."

56.     Atkin accused Tellez of theft, without merit.

57.     Atkin accused Tellez of breaking equipment, without merit.

58.     Atkin falsely accused Tellez of failing to keep his areas clean.

59.     Atkin ordered Tellez to do tasks, even when it was not within his job duties to give Tellez instructions.

60.     In addition to verbally accosting Tellez, Atkin physically intimidated and

messed with Tellez's work in a way that made it more difficult for Tellez to be a productive employee on a near daily basis—which contributed to Tellez's hostile work environment.

61.     For example, Atkin accused Tellez of taking parts that Atkin ordered, without merit.

62.     Atkin accused Tellez of placing used parts on Atkin's transport vehicle, without merit.

63.     Atkin attempted to alter Tellez's clock-in data.

64.     Atkin would start the sorter while Tellez was inside of it and without announcing on the radio to start the sorter, which could have caused significant harm to Tellez and made him fearful for his safety.

65.     Atkin put his soiled rags on Tellez's equipment.

66.     Atkin activated equipment while Tellez was servicing it, without Tellez's consent.

67.     Atkin denied Tellez the right to use breaks and use the bathroom, without justification.

68.     Atkin made false and misleading allegations about Tellez and failed to maintain company standards, which resulted in lost wages, missed training opportunities, and lost opportunities to advance.

69.     Tellez tried to offer kindness to Atkin in hopes that they could have a professional and non-confrontational relationship.

70.     Despite Tellez's best efforts, Atkin refused to act in any way other than as Tellez's tormentor.

71.     When Tellez asked Atkin to treat him respectfully, consistent with Walmart's professed company policies, Atkin responded, "Fuck no."

72.     This comment, along with a substantial amount of the hostility, took place in front of Walmart managers and supervisors who failed to take any action to discipline Atkin or otherwise discourage his discriminatory and harassing behaviors.

73.     Atkin's disrespect and bullying of Tellez was because of Tellez's race and ethnicity.

74.     In addition to Atkin, other Walmart employees racially harassed Tellez and made negative comments about Hispanics and Mexicans.

75.     For example, one employee told Tellez not to speak Spanish, "because we're in America."

76.     Tellez was also told by a coworker that nobody wanted to work with him because they might get in trouble.

77.     Others made negative comments to or about Tellez, generally ignored him, and treated him as less worthy than his white counterparts.

78.     Kenny Dimmitt ("Dimmitt") was a Shift Manager for Walmart at the Distribution Center.

79.     Dimmitt was another one of Tellez's harassers.

80.     Dimmitt's racially harassing behavior was severe and pervasive.

81.     Dimmitt's racially harassing behavior was so severe and pervasive that it altered the terms and conditions of Tellez's employment

82.     Dimmitt was one of Tellez's direct supervisors.

83.     During the winter of 2020-2021, Tellez fell on ice while at work. He reported the incident to Dimmitt, but Dimmitt intimidated Tellez and told him not to report the incident and refused to report it himself.

84.     Dimmitt refused to report Tellez's workplace injury because of Tellez's race and ethnicity.

85.     Dimmitt discriminated against Tellez in the terms and conditions of his employment by, among other things, denying Tellez on the clock training that would have advanced his career and pay.

86.     Dimmitt accused Tellez of stealing parts, without merit.

87.     Dimmitt claimed that he could not be racist because he ate beans with a Mexican family in a trailer park.

88.     Dimmitt described Mexicans as "God damn fucking Mexicans."

89.     Dimmitt stated to Tellez, "you mother fucking Mexicans."

90.     Dimmitt was previously written up because of a prior conversation with another Hispanic employee.

91.     Dimmitt told Tellez that he was replaceable and that a monkey could do his job.

92.     Dimmitt openly stated that he did not want to work with Tellez.

93.     Dimmitt required Tellez to do undesirable tasks that other mechanics were not required to do, including cleaning assignments.

94.     Dimmitt required Tellez to do the cleaning assignments because of his race and ethnicity.

95.     Dimmitt did not make white employees do these cleaning tasks, regardless of rank or tenure.

96.     Operations Manager Les Cox ("Cox") also treated Tellez differently based on his race and ethnicity.

97.     Cox's hostility towards Tellez contributed to Tellez's hostile work environment.

98.     After Tellez began working at the Distribution Center, Cox made Tellez wait for more than a year and a half to receive his new hire tools and supplies.

99.     Tellez's white counterparts received their new tools in less than two months after starting work.

100.     Tellez was also forced to wear another employee's uniform, which was way too large for him and thus was dangerous as it could have gotten caught in equipment, causing injury to Tellez.

101.     Nobody cared about the way it made Tellez feel about having to wear someone else's uniform that did not fit him.

102.     Dimmitt, in cahoots with Cox, tried to force Tellez to take responsibility for something that he did not do.

103.     Specifically, Dimmitt and Cox told Tellez to take the blame for displacement of chemical solvents that created belt slippage. However, they knew that it was not Tellez's fault as he was not even working in that area.

104.     The discrimination and harassment that Tellez suffered through came to a head on February 14, 2021.

105.     On February 14, 2021, Atkin engaged in harassing behavior towards Tellez by

refusing to provide Tellez with a copy of the daily preventative maintenance ("PM") sheets even though he provided a copy to every other employee who needed one.

106.　This was not the first time Atkin singled-out Tellez by refusing to give him the PM sheet, as this had happened on a number of previous occasions.

107.　Atkin refused to provide a PM sheet to Tellez because of his race and ethnicity.

108.　Rather than confront his harasser, Tellez asked a coworker if he could make a copy.

109.　When Atkin noticed that Tellez was trying to make himself a copy, Atkin aggressively confronted him and ordered, "Give me those papers!"

110.　Tellez responded, "I'll give it back after I make a copy."

111.　Atkin stormed off to complain to Dimmitt, and Tellez followed Atkin to Dimmitt's office.

112.　In Dimmitt's office, Atkin gaslighted Tellez and accused Tellez of making a complaint about a hostile work environment to human resources ("HR").

113.　Atkin admitted to harassing Tellez but claimed that he only harassed Tellez in retaliation for complaining about Atkin to HR.

114.　Atkin's justification of treating Tellez differently because of alleged HR complaint made no logical sense, as Atkin had always treated Tellez differently based on Tellez's race and ethnicity.

115.　When Tellez denied having complained to HR, Atkin looked at Dimmitt and said, "That's what you told me!" Dimmitt responded: "I said it could have been [Tellez]."

116.　During the meeting, Tellez's frustration with the ongoing harassment,

discrimination, and retaliation boiled over when he learned that Atkin was openly admitting to retaliating against him and treating him differently than other coworkers.

117.   Tellez stated, "Buck, you have been retaliating against me and treating me like shit, acting like a dickwad since Matt left last year because you thought I called you in for retaliation and hostile work environment and your response was to now retaliate even more?"

118.   Tellez had had enough and stated that now, he was going to go to HR to complain about Atkin's harassing and discriminatory behavior.

119.   Previously, Tellez had only complained to management within the Distribution Center about Atkin's discrimination and harassment.

120.   In response to Tellez's prior complaints of harassment and discrimination, Walmart management scolded Tellez and told him that he was too sensitive and to just ignore his harassers.

121.   Due to Walmart stifling Tellez's prior complaints of harassment and discrimination, Tellez attempted to bear the burden of the racial hostility.

122.   When Tellez tried to reiterate his complaints about the discrimination and harassment on February 14, 2021, Dimmitt stated that there was no need to file a complaint with HR and that he would type up and submit a report.

123.   During the meeting on February 14, Atkin interrupted and talked over Tellez, barely letting him speak.

124.   Dimmitt allowed Atkin to harass Tellez during the meeting.

125.   Following Atkin's admission that he was harassing Tellez and intentionally retaliating against him, no appropriate corrective action was taken.

126.     Despite Atkin's harassment and discrimination, Walmart was considering Atkin for a promotion in March of 2021.

127.     On or around March 5, 2021, Tellez filed a formal complaint of discrimination and harassment with Walmart's HR Department ("Formal HR Complaint").

128.     In Tellez's Formal HR Complaint, Tellez complained about, *inter alia*:

    a.   Atkin's harassing behavior on February 14, 2021;

    b.   Atkin prevented Tellez from taking work breaks;

    c.   Prior complaints he made to Dimmitt about Atkin's harassing and discriminatory behaviors;

    d.   Atkin threatening to punch Tellez so hard that it would break every bone in Atkin's wrist;

    e.   Atkin's disrespectful behavior of intentionally and persistently interrupting Tellez while he tried to explain the harassment and discrimination;

    f.   Dimmitt dismissing Tellez's complaints of discrimination and harassment by telling him that he's "too sensitive";

    g.   Atkin calling Tellez "stupid" and telling him that he had "half a brain";

    h.   Atkin responding to Tellez's request for Atkin to be respectful by saying "fuck no";

    i.   Atkin throwing his dirty rags on the ground in front of Tellez and on Tellez's cart;

    j.   Atkin intentionally making Tellez's job more difficult;

    k.  Atkin calling Tellez a "fat ass";

    l.  Atkin disrespectfully referring to Tellez's race and national origin;

    m.  Atkin talking about his mother's "fantasy of being accosted by two fat sweaty Mexicans while being gangbanged in the back of an old ford pinto in the lot of a trailer park," and how highly offensive this was to Tellez;

    n.  Atkin calling an adjustable wrench a "Mexican speed wrench";

    o.  Atkin falsely accusing Tellez of theft;

    p.  Atkin diminishing Tellez's integrity;

    q.  Atkin making discriminatory remarks about people from Iraq and Afghanistan and attributing negative stereotypes to people of Middle Eastern descent and Atkin telling Tellez that Tellez reminded him of Middle Eastern People; and

    r.  Atkin's behavior created "incensed emotion of pain and received hostility for the environment I work in."

129.    Walmart received Tellez's Formal HR Complaint on or around March 16, 2021.

130.    Following Tellez's Formal HR Complaint, Walmart failed to take appropriate action to protect Tellez or otherwise prevent him from being discriminated and retaliated against.

131.    Atkin continued to harass and discriminate against Tellez following Tellez's Formal HR Complaint.

132.    Atkin continued his campaign of retaliation following Tellez's Formal HR

Complaint.

133.    Atkin called out Tellez, in front of coworkers, for complaining about the harassment and discrimination—which further alienated Tellez from his coworkers.

134.    In retaliation for Tellez's complaints of discrimination and harassment, on or around April 12, 2021, Walmart gave him a Step 1 write up.

135.    The Step 1 write up was Tellez's first corrective action in his nearly three-year tenure with Walmart, and management bypassed issuing lower levels of corrective actions such as occurrences or coaching.

136.    Any disciplinary action against Tellez was unwarranted, as foul language was used with great regularity by workers, supervisors, and managers at the Distribution Center, including during informal conversations and during meetings.

137.    Walmart employees at the Distribution Center regularly used offensive, discriminatory, and/or misogynistic language to insult coworkers, including the following terms that were used to describe Tellez and/or names that he heard coworkers use in reference to other people:

        a.  Monkeys

        b.  Pussy

        c.  Fag

        d.  Fucking faggot

        e.  Gay

        f.  Idiots

        g.  Morons

h.  Bitches

i.  Beaner

j.  Stupid

k.  Fucking stupid

l.  Fucking morons

m.  Fucking retards

n.  Shit for brains

o.  Remedial

p.  Asshole

q.  Piece of shit

r.  Mother fucker

s.  Fucker

t.  Fucking assholes

u.  Pussy

138.   Walmart employees at the Distribution Center regularly used colorful language and descriptors generally, as well, including the following offensive terms:

a.  Fucking Mexicans

b.  Nigger-rigged

c.  Jerry-rigged

d.  Dikes

e.  Bitches

f.  Fucking wetbacks

g.  Spics

139.    Walmart supervisors and managers alike frequently overheard these discriminatory and misogynistic comments and knew they were commonplace at the Distribution Center.

140.    Walmart refused to correct employees who engaged in inappropriate language or otherwise discourage the insulting language, thereby fostering the hostile work environment that Tellez was subjected to.

141.    Following the unwarranted and retaliatory discipline, Tellez contacted the Equal Employment Opportunity Commission ("EEOC").

142.    On May 27, 2021, Tellez filed a formal EEOC Charge of Discrimination alleging a hostile work environment, discrimination, and retaliation ("First EEOC Charge").

143.    In response, the hostile work environment as alleged above continued, unabated.

144.    In addition to subjecting Tellez to a hostile work environment, Walmart denied Tellez the same terms and conditions of employment as his white coworkers.

145.    Walmart denied Tellez the same terms and conditions of employment as his white coworkers before and after he filed the First EEOC Charge.

146.    Walmart denied Tellez a promotion on one or more occasions.

147.    After Mechanic Don Kelly's ("Kelly") retirement, Kelly recommended that Tellez speak with Dimmitt about a potential promotion.

148.    Tellez formally submitted his application for Fire Brigade to Cox but he was denied the promotion, based on discriminatory and retaliatory animus.

17

149.    Tellez was also denied the promotional opportunity of becoming a Multitech.

150.    In order to become a Multitech, Tellez required additional training, which was only available as on the clock study.

151.    Tellez requested the onsite training, but Atkin laughed in his face whenever he requested it and denied him the opportunity, based on Atkin's discriminatory and retaliatory animus towards Tellez.

152.    Dimmitt also refused to allow Tellez to do training modules, including for Dematic and Intelligrated Machine Training.

153.    By denying Tellez training opportunities, it made it look like he had measurable late and incomplete training modules; however, it was through no fault of his own.

154.    On or around March 26, 2022, Walmart promoted Tellez to Maintenance Technician.

155.    Tellez earned and deserved the promotion.

156.    Walmart did not want to promote Tellez.

157.    Upon information and belief, Walmart promoted Tellez to Maintenance Technician in order to avoid the appearance of discriminating and retaliating against Tellez.

158.    After Tellez filed the First EEOC Charge, Walmart began monitoring Tellez.

159.    Walmart began monitoring Tellez in the hopes that it would be able to justify his termination.

160.    Even after Walmart promoted Tellez to Maintenance Technician, Walmart continued monitoring Tellez.

161.    Walmart had no legitimate business reason to monitor Tellez.

162.    Because Tellez was such an excellent employee, Walmart never found a legitimate reason to terminate his employment.

163.    Walmart monitored Tellez for more than a year after Tellez filed the First EEOC Charge.

164.    In the Spring of 2022, Tellez became the backup safety lead.

165.    Walmart did not want Tellez to be the backup safety lead.

166.    Upon information and belief, Walmart promoted Tellez to backup safety lead in order to avoid the appearance of discriminating and retaliating against Tellez.

167.     Walmart was forced to promote Tellez to backup safety lead, because Tellez had a clean accountability and disciplinary matrix and was next in line for the promotion based on his position and seniority.

168.    On or around May 16, 2022, Tellez was assigned to work on a forklift.

169.    During and after his break on that day, Tellez asked a number of questions to the Safety Lead Daniel Beckett ("Beckett") about working on the forklift.

170.    Beckett was a very experienced and well-respected employee.

171.    Beckett had nearly twenty years of experience working for Walmart as a mechanic.

172.    As of March of 2022, Beckett had a clean accountability and disciplinary matrix.

173.    Tellez and Beckett talked for approximatly 15 minutes about safety issues for working on the forklift.

174.    The entire time that Tellez and Beckett talked about the forklift, they were doing

so for the benefit of Walmart and thus it was on the clock work which was properly categorized as paid time.

175.    On that day, neither Tellez nor Beckett took a longer break than was permitted.

176.    On that day, Walmart was monitoring Tellez in retaliation for his prior complaints.

177.    Two weeks later, on Monday May 30th, 2022, Tellez showed up for work and was stopped by Operations Manager Josh Gustafson prior to clocking in.

178.    Gustafson ushered Tellez into the AP office and told Tellez to wait for Cox.

179.    During the meeting with Gustafson and Cox, Tellez asked what the meeting was about, and Cox stated that it was about a break that Tellez took two weeks earlier.

180.    Cox was hostile and agitated during the meeting.

181.    Cox informed Tellez that he was being placed on an unpaid suspension for taking too long of a break.

182.    Tellez suggested that he was probably discussing work related matters during the period that exceeded his break.

183.    Tellez objected to the fact that within the last few months, he missed a substantial number of his breaks because he was too busy to take all of his scheduled breaks.

184.    Tellez was previously told by Dimmitt and other managers/supervisors at Walmart, that if you miss a break, then you can make it up at a future time.

185.    Making up for a missed break was standard policy and practice at Walmart's Distribution Center.

186.    In light of the standing policy that an employee can make up for missed breaks,

Tellez objected to Cox and raised this as a defense to the suspension.

187.    Cox told Tellez that it did not matter whether he had missed breaks on previous occasions and acted with complete ambivalence as to Tellez's statements and concerns.

188.    Tellez objected to Cox's dismissive attitude and requested that his concerns be addressed per the Sundown Rule.

189.    The Sundown Rule is a principle that encourages people to address issues and questions promptly, rather than putting them off until later.

190.    The Sundown Rule was coined by Sam Walton and adopted as a policy at Walmart, where it means that requests were answered by sundown on the day they were received.

191.    Cox again disregarded Tellez and told him that it did not matter.

192.    Finally, Tellez raised the issue of retaliation, asserting that it appeared that he was being retaliated against for engaging in protected activities.

193.    Cox responded by referring to Tellez's complaints of discrimination, harassment, and retaliation as "games."

194.    Frustrated, Tellez looked at Cox and stated: "Les, with all the things that I have been dealing with in the last few years here, I do not consider these games. I take this very seriously."

195.    To end the meeting, Cox asked for the best phone number to reach Tellez, told him that the suspension would not have a timeline.

196.    Cox told Tellez that HR Director Bill Clauser would contact him.

197.    Gustafson took notes during the meeting.

198.   Upon request, Tellez handed in his badge and left the property.

199.   The only reason why Walmart claimed that Tellez took too long of a break is because Walmart was monitoring Tellez in an effort to justify his termination.

200.   Walmart's motivations for monitoring Tellez were improper, discriminatory, and retaliatory.

201.   If Walmart had not been improperly monitoring Tellez, it never would have disciplined Tellez.

202.    During the "break" in question, Tellez was not actually taking a break.

203.   Rather, Tellez was working for the benefit of Walmart during the time in question.

204.   Specifically, Tellez had been tasked with working on forklift equipment to repair and do preventive maintenance.

205.   At the time, Tellez was the newly promoted backup safety team leader in his department.

206.   Tellez had many questions about safely working on the forklift equipment.

207.   It would have been unsafe for Tellez to work on the forklift equipment without getting additional information from Beckett.

208.   Tellez asked Beckett several questions about workplace safety and how to work on the forklift.

209.   During the entire time when Walmart accused Tellez of "stealing time," he was talking with Beckett regarding work related matters, for the benefit of Walmart.

210.   In June of 2022, Tellez contacted Walmart's ethics hotline to complain about

the fact that he was suspended.

211.    During his suspension, he reached out to corporate to express concerns about harassment, discrimination, and retaliation.

212.    Walmart's corporate office ignored his concerns.

213.    In response to his ethics complaint, Walmart promised: "Walmart does not tolerate retaliation against someone for reporting concerns."

214.    Walmart failed to live up to its promises.

215.    Clauser never contacted Tellez by phone, email, or any other method of communication prior to Tellez's termination.

216.    Walmart also told Tellez that he would have an opportunity to speak with General Manager Bill Hornick.

217.    Hornick never contacted Tellez.

218.    Tellez was never provided an opportunity to explain any facts to Hornick.

219.    Walmart denied Tellez an opportunity to respond to the allegations against him because it wanted to terminate his employment.

220.    Walmart wanted to terminate Tellez's employment because of its discriminatory and retaliatory animus against Tellez.

221.    Specifically, Tellez contacted Walmart to provide sufficient information about the hostile work environment he suffered through and the retaliation he faced, but Walmart refused to act.

222.    On or around June 8, 2022, while Tellez's charge of discrimination was still pending with the EEOC, Walmart terminated his employment.

223.    Walmart terminated Tellez without conducting an appropriate investigation.

224.    Walmart knew or should have known that Tellez had a justification for what he was doing during and after his break.

225.    Walmart terminated Tellez's employment because of his race and ethnicity.

226.    Walmart terminated Tellez's employment in retaliation for him engaging in protected activities, i.e. complaining internally of discrimination and harassment and filing an administrative charge with the EEOC, alleging discrimination, harassment, and retaliation.

227.    Walmart claimed that it terminated Tellez because he took too long of a break.

228.    Walmart's stated termination reason is mere pretext for its illegal motives.

229.    Walmart was aware that its employees at the Distribution Center frequently took longer breaks than what was authorized.

230.    Multiple employees would sit in the manager's office and watch TikTok and YouTube videos while "on the clock" but were never disciplined.

231.    Multiple employees at the Distribution Center would take smoke breaks whenever they wanted, without repercussions.

232.    Walmart was aware that its employees at the Distribution Center frequently did non-work-related tasks while "on the clock."

233.    Walmart knew or should have known that Tellez was engaging in work related tasks at the time Walmart accused him of "stealing time."

234.    Walmart knew that Tellez was not a person who abused his breaks or otherwise slacked off at work.

235.    Walmart knew that Tellez often skipped his breaks in order to complete work

related tasks.

236.   Even if Tellez was guilty of what he was accused of, he should not have been terminated.

237.   In light of all the relevant circumstances, what Tellez was accused of was a minor infraction.

238.   If Tellez was guilty of what he was accused of, at the most, he should have been given a lesser discipline.

239.   Additionally, Tellez had a clean accountability and disciplinary matrix, and thus the discipline was substantially more severe than normal per Walmart's policies, procedures, and practices.

240.   In addition to terminating Tellez, Walmart also wrongfully terminated the employment of Beckett.

241.   Beckett was an employee who had worked at Walmart for nearly 20 years at the time of his termination.

242.   Beckett had maintained a pristine personnel file and had no coaching or disciplinary steps.

243.   Beckett was told by Walmart management that Beckett was at the "wrong place, wrong time."

244.   Walmart management told Beckett that Walmart was investigating Tellez.

245.   Walmart indicated to Beckett that Walmart did not want to terminate him but that he was being terminated in order to undermine any legal claims asserted by Tellez.

246.   Beckett was not interviewed during any investigation, prior to being terminated.

247. Had Walmart interviewed Beckett, it would have learned that neither him nor Tellez did anything improper.

248. Following Tellez's termination, he contacted Walmart to request that his termination be reversed and explained that the termination was discriminatory and retaliatory.

249. By refusing to reverse Tellez's termination, Walmart's corporate office implicitly and explicitly approved of and supported the discrimination, harassment, and retaliation that Tellez suffered through.

250. Walmart also refused to provide Tellez with a copy of his personnel file, in violation of Colorado law.

251. Throughout his employment, Tellez suffered from emotional distress. He lost sleep and constantly worried, while at work and at home.

252. Tellez feared for his physical safety, which caused him to lose focus and concentration at work.

253. Walmart's discriminatory and retaliatory termination of Tellez has taken a substantial toll on his financial and emotional well being and continues to cause him extensive damages.

**FIRST CLAIM FOR RELIEF**
**DISCRIMINATORY TERMS AND CONDITIONS OF EMPLOYMENT**
**(Pursuant to Section 1981 & Title VII)**

254. Plaintiff incorporates herein all of the foregoing allegations in this Complaint.

255. Plaintiff is a Hispanic man.

256. Plaintiff was an employee of Defendants.

257. During Plaintiff's employment, Defendants discriminated against him in nearly

all terms and conditions of his employment, including in pay, training, promotion, breaks, discipline, suspension, investigations, monitoring, and termination.

258.    Plaintiff has incurred and continues to suffer economic damages as a result of Defendants' discriminatory terms and conditions of employment.

259.    Plaintiff has suffered emotional distress and other damages because of the discriminatory terms and conditions of employment to which Defendants subjected him.

260.    Defendants' conduct in discriminating against Plaintiff was deliberate and malicious and exhibited a wanton disregard of Plaintiff's rights.

**SECOND CLAIM FOR RELIEF**
**RETALIATORY TERMS AND CONDITIONS OF EMPLOYMENT**
**(Pursuant to Section 1981 & Title VII)**

261.    Plaintiff incorporates herein all of the foregoing allegations in this Complaint.

262.    Plaintiff complained internally to Defendants about being discriminated against.

263.    Plaintiff engaged in additional protected activities when he filed charges of discrimination, harassment, and retaliation with the Equal Employment Opportunity Commission.

264.    Defendants retaliated against Plaintiff because Plaintiff opposed and complained about discrimination to which he was subjected.

265.    Defendants retaliated against Plaintiff by disciplining him.

266.    Defendants retaliated against Plaintiff by monitoring him.

267.    Defendants retaliated against Plaintiff by suspending him.

268.    Defendants retaliated against Plaintiff by terminating his employment.

27

269.    Defendants' conduct in subjecting Plaintiff to retaliation was deliberate and malicious and exhibited wanton disregard for the rights of Plaintiff.

### THIRD CLAIM FOR RELIEF— HOSTILE WORK ENVIRONMENT
**(Pursuant to Section 1981 & Title VII)**

270.    Plaintiff incorporates herein all of the foregoing allegations in this Complaint.

271.    Defendants subjected Plaintiff to a racially hostile work environment.

272.    The hostile work environment was severe and pervasive.

273.    The hostile work environment was so severe and pervasive that it altered the terms and conditions of employment for Plaintiff.

274.    Defendants' conduct in subjecting Plaintiff to a racially hostile work environment was deliberate and malicious and exhibited wanton disregard for the rights of Plaintiff.

**WHEREFORE,** Plaintiff respectfully request that this Court grant him the following relief:

1.    Back pay and actual damages in an amount to be shown at trial to compensate Plaintiff for lost wages, benefits, and employment opportunities;

2.    Front pay in an amount to be shown at trial and/or reinstatement;

3.    Compensatory damages for pecuniary and non-pecuniary losses;

4.    Punitive damages;

5.    Reasonable attorneys' fees and costs, including expert witness fees;

6.    Pre-judgment and post-judgment interest;

7.    Compensation for consequential damages in the form of taxes incurred;

8.    Permanent injunction restraining these violations of the Civil Rights Act of

1866 and the Civil Rights Act of 1964; and

9.    Such other and further relief as this Court deems necessary and proper.

**JURY TRIAL DEMAND**

Plaintiff respectfully requests a jury trial on all questions of fact raised by this complaint.

Respectfully submitted this 24th day of September 2024.

JESTER GIBSON & MOORE, LLP

*s/  Justin M. Plaskov*
Justin M. Plaskov, #45053
1999 Broadway, Ste. 3225
Denver, CO 80202
(303) 377-7888
jplaskov@jgllp.com